No. 65,218

EVELYN L. HERBSTREITH, *Appellant,* v. JAN DE BAKKER, M.D.,
and ST. FRANCIS REGIONAL MEDICAL CENTER, *Appellees.*

(815 P.2d 102)

Opinion filed July 12, 1991.

*Dwight A. Corrin*, of Corrin & Krysl, Chartered, of Wichita, argued the cause, and *Shannon S. Krysl*, of the same firm, was with him on the brief for appellant.

*Steven C. Day*, of Woodard, Blaylock, Hernandez, Pilgreen & Roth, of Wichita, argued the cause and was on the brief for appellee Jan de Bakker, M.D.

*Charles E. Hill*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause and was on the brief for appellee St. Francis Regional Medical Center.

*Marla J. Luckert*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, was on the brief for *amicus curiae* Kansas Hospital Association.

The opinion of the court was delivered by

Six, J.: This is a medical malpractice case. The action was filed by Evelyn Herbstreith against Jan de Bakker, M.D., and St. Francis Regional Medical Center (St. Francis). St. Francis counterclaimed for unpaid hospital bills.

The trial court granted summary judgment to St. Francis on Mrs. Herbstreith's claim. The issues, in addition to the propriety

of the favorable summary judgment ruling for St. Francis, arise from (1) evidentiary rulings relating to Dr. de Bakker's medical practice, (2) considerations of the medical peer review privilege under K.S.A. 1990 Supp. 65-4915(b) and waiver of the privilege under K.S.A. 60-437, and (3) the directed verdict for St. Francis on its counterclaim.

Mrs. Herbstreith's claim against St. Francis was based upon allegations of negligent failure to: (1) supervise Dr. de Bakker; and (2) limit or revoke his surgical privileges.

The jury found Dr. de Bakker had departed from the standard of care applicable to a surgeon, but that such departure did not cause Mrs. Herbstreith's injuries. The trial court directed a verdict in favor of St. Francis on its hospital bill counterclaim.

### Facts

Mrs. Herbstreith lived in Wichita, Kansas, from 1977 to mid-1986. She moved to her former home in Tennessee where she was treated and hospitalized in September 1986. Outpatient x-rays revealed cholelithiasis (presence of a gallstone) and diverticulosis (presence of diverticuli, "ballooning" or "out-pouching" of the colon).

Mrs. Herbstreith returned to Wichita and brought the Tennessee x-rays with her. Dr. de Bakker had been her family physician since 1982. She saw Dr. de Bakker on September 30, 1986, and provided him with the x-rays. He had performed various surgical procedures on her between 1982 and 1985. During the September 30 examination, Mrs. Herbstreith complained of: (1) abdominal pain primarily in the left upper quadrant; (2) diffuse epigastric (anterior walls of abdomen) pain; (3) nausea and vomiting; (4) fatty food intolerance; and (5) generally not feeling well.

Based on the Tennessee x-rays, her physical complaints, and her physical examination, Dr. de Bakker diagnosed: (1) a chronic infection of the gallbladder with gallstones and (2) diverticulosis and diverticulitis (inflamation and infection of the diverticuli). Dr. de Bakker testified that he did not order additional tests such as a C.T. scan or ultrasound because the x-rays from Tennessee were adequate.

Dr. de Bakker recommended that Mrs. Herbstreith be admitted to St. Francis for the removal of her gallbladder and for

treatment of possible infectious disease of the colon. She was admitted September 30 for surgery on October 3, 1986.

Dr. de Bakker performed an exploratory laparotomy (exploration inside the abdomen). The colon had multiple pockets of diverticuli which were not acutely inflamed. A colon resection was not indicated. Dr. de Bakker also explored the abdominal organs and discovered a "softball-size" mass within the pancreas. (The pancreas is normally the size of a pear.) The mass had the appearance of a tumor. Dr. de Bakker took a wedge biopsy and approximately five needle biopsies of the pancreatic mass. The five needle biopsies were taken because of the difficulty in determining the tumor's location within the mass. The biopsies were submitted for laboratory analysis while the surgical team waited. The immediate pathology report reflected subacute pancreatitis. Dr. de Bakker did not resect the pancreas because of the great lethal potential of such surgery and because he did not have surgical consent. According to Dr. de Bakker, the mortality rate of any form of pancreatic resection is 3 to 5 percent, and the complication rate of a pancreatic resection is 30 to 35 percent.

Following the biopsies, Dr. de Bakker removed the gallbladder. The pathology report confirmed chronic inflamation and infection of the gallbladder and the presence of gallstones.

Following the surgery, Dr. de Bakker recommended that Mrs. Herbstreith return to surgery to have the pancreatic mass resected because he was unable to assure her that the mass was not malignant. He recommended promptness for three reasons: (1) concern that adhesions would recur (Mrs. Herbstreith had adhesions from past surgery which, according to Dr. de Bakker, caused difficulty for the surgeon in distinguishing the peritoneum from the bowel); (2) timely removal of the potential malignant tumor; and (3) concern over the psychological well being of Mrs. Herbstreith (she knew she had a potential malignant tumor growing inside her).

The "in depth" pathologist's report of October 6, 1986, on the pancreatic mass indicated Mrs. Herbstreith had a nonfunctioning islet cell tumor. Nonfunctioning islet cell tumors have a high rate of malignancy, 92 percent according to one study. The biopsy results were inconclusive. With an islet cell tumor it is difficult

or impossible to determine through laboratory examinations whether the tumor is benign or malignant.

Dr. de Bakker evaluated Mrs. Herbstreith's condition and concluded that she was a candidate for additional surgery. She underwent surgery on October 8, 1986, to resect the pancreatic tumor. The surgery progressed as anticipated.

Mrs. Herbstreith was discharged October 31, 1986. She was readmitted November 4, 1986, with acute abdominal pain. It was determined that she had a blockage in the bowel. (Dr. de Bakker used the term "bowel" interchangeably with the term "small intestine.") Dr. de Bakker testified that three factors contributed to the blockage: (1) recurrence of diverticular disease of the colon with diverticulitis; (2) recurrence of intra-abdominal adhesions; and (3) leakage of pancreatic fluids.

Dr. de Bakker operated on Mrs. Herbstreith a third time. He found a 2- to 3-foot bundle of small intestine that was "twisted, turned, blackened, dead." Dr. de Bakker resected approximately 3 to 4 feet of the small intestine and part of the colon. (The human body has approximately 20 feet of small intestine.) A temporary colostomy was also performed. Dr. de Bakker testified the colostomy procedure is necessary any time the colon is resected.

Mrs. Herbstreith was eventually discharged in December 1986. She had an open wound and an intestinal fistula which was draining. (Although not defined in the record, an intestinal fistula is a passage or tract leading from the bowel to the external surface. Stedman's Medical Dictionary, pp. 534-35 [5th lawyer's ed. 1982].)

Mrs. Herbstreith was readmitted to the hospital for observation in January 1987, to rule out intestinal obstructions. The hospitalization was uneventful. Her condition resolved and she was discharged four days later.

Dr. de Bakker continued to follow up with Mrs. Herbstreith in his office. At some point Mrs. Herbstreith stated that she wanted to return to Tennessee. On January 23, 1987, she still had the intestinal fistula. Dr. de Bakker tried to "shut this off" by utilizing a Foley catheter with no success. He told Mrs. Herbstreith she could return to Tennessee if she was careful concerning

her condition and drainage. According to Mrs. Herbstreith, Dr. de Bakker told her that her stomach would or should heal itself.

Mrs. Herbstreith traveled to Peoria, Illinois. On January 28, 1987, she was treated for a small bowel fistula at Peoria's St. Francis Medical Center. She later returned to Peoria's St. Francis to have her colostomy closed.

### Trial Court Rulings

In 1988, Mrs. Herbstreith filed a medical malpractice action against Dr. de Bakker, St. Francis, and two residents at St. Francis, alleging that carelessness and negligence in the initial and subsequent treatment of her gallbladder attack caused her pain, mental anguish, temporary and permanent disabilities, and medical, hospital and nursing expenses. The complaints against the residents were dismissed with prejudice by the court.

Following discovery, St. Francis filed a motion for summary judgment. In response, Mrs. Herbstreith sought to amend her petition to add a claim for gross and wanton negligence and punitive damages. She alleged that Dr. de Bakker had a habit of performing unnecessary surgery and that St. Francis knew of this habit. The trial court found that much of the evidence Mrs. Herbstreith relied upon was protected by the peer review privilege established by K.S.A. 1990 Supp. 65-4915. The trial court denied the motion, finding that Mrs. Herbstreith had not established that there was a probability she would prevail on a claim for punitive damages. K.S.A. 1990 Supp. 60-3703.

St. Francis then filed a second motion for summary judgment incorporating by reference its prior motion. St. Francis argued that Mrs. Herbstreith could not establish a causal connection between any of its alleged negligence and her injuries. First, St. Francis asserted that when Mrs. Herbstreith sought out Dr. de Bakker she made no request to be admitted to St. Francis. Because Dr. de Bakker had unrestricted surgical privileges at Wesley Medical Center and St. Joseph Hospital (both in Wichita), he could have admitted Mrs. Herbstreith into either of those two hospitals. Thus, Mrs. Herbstreith's injuries would still have occurred absent St. Francis' alleged negligence. Second, St. Francis asserted that Mrs. Herbstreith's expert, Joel Grossman, M.D., should not be allowed to express his opinion as to St. Francis'

negligence because (1) Dr. Grossman was not qualified to testify as an expert as he lacked the necessary background and experience, and (2) there would be no factual basis in evidence at trial to support Dr. Grossman's opinions.

The trial court granted St. Francis' motion for summary judgment. The trial court reasoned that no sufficient factual basis existed for Dr. Grossman to express an opinion. Dr. Grossman was expected to testify that St. Francis was negligent by not limiting, suspending or revoking Dr. de Bakker's surgical privileges prior to Mrs. Herbstreith's treatment.

The trial court noted in its journal entry on summary judgment that another judge, in ruling on Mrs. Herbstreith's motion to amend, found that all evidence relating to Dr. de Bakker's prior restrictions of hospital privileges was privileged. The only other evidence advanced by Mrs. Herbstreith was that five other lawsuits had been filed against Dr. de Bakker. St. Francis was a defendant in only two of those cases. The first claim against St. Francis did not arise until July 1986. The second case was filed 20 days before Mrs. Herbstreith's hospital admission. Absent expert opinion testimony or some other way to prove her claims, the trial court concluded no genuine issue of material fact, as to St. Francis, was in controversy.

## The Jury Trial

Mrs. Herbstreith's remaining claims against Dr. de Bakker and St. Francis' counterclaim were tried to a jury. Mrs. Herbstreith's expert, Bruce Moorstein, M.D., of Oakland, California, testified that Dr. de Bakker departed from the standard of care of a surgeon in performing the initial surgery. According to Dr. Moorstein: (1) there was an insufficient diagnostic workup and no evidence of diverticulitis and acute gallbladder disease; (2) Dr. de Bakker should have performed an ultrasound or a C.T. scan of the abdomen, which may have revealed the pancreatic mass; (3) the second surgery to resect the pancreatic mass was not indicated at that time; (4) there was an insufficient preoperative workup for the second surgery; and (5) there was no emergency reason for the second surgery which set up a series of potential risks to Mrs. Herbstreith.

Dr. Moorstein testified that Mrs. Herbstreith's complications, necrosis (death of tissue caused by loss of blood supply), or infarction, of her small intestine and colon and the small bowel fistula, were directly related to and the result of the two decisions to operate. Dr. Moorstein reasoned that, if the pancreatic mass had been discovered preoperatively, the chances of complications would have been significantly less.

Dr. de Bakker's expert witness, Dillis Hart, M.D., of Wichita, testified that Dr. de Bakker used good medical judgment in taking Mrs. Herbstreith to surgery on October 3, 1986. In Dr. Hart's opinion, no additional diagnostic studies were indicated. Dr. Hart also opined that recommending the second surgery on October 8, 1986, was very good medical judgment.

The jury heard the opposing testimony of the two experts. The case against Dr. de Bakker was submitted to the jury on special questions. The jury returned its verdict as follows:

"VERDICT FORM

"1. Did Dr. de Bakker depart from the standard of care applicable to a surgeon in any of the particulars alleged by the plaintiff?
"Yes __X__ No _____
"Proceed to question 2 only if you answered question 1, yes.
"2. If you answered question 1 yes, did Dr. de Bakker's departure from the standard of care cause injury to the plaintiff?
"Yes _____ No __X__"

At the close of Mrs. Herbstreith's case, the trial court granted St. Francis' motion for a directed verdict on its counterclaim for unpaid medical bills plus interest.

## The Peer Review Statute, K.S.A. 1990 Supp. 65-4915

At the hearing upon Mrs. Herbstreith's motion to amend her petition and assert a claim for punitive damages, the trial court excluded certain evidence. The trial court held that the evidence excluded fell within the protection of K.S.A. 1990 Supp. 65-4915(b) and that St. Francis had an absolute privilege to preclude its admission.

The excluded evidence consisted of: (1) a letter from Dr. de Bakker to Sister Sylvia Egan, President and Chief Executive Officer of St. Francis (resigning his endoscopy privileges at St. Francis); (2) a letter from Sister Sylvia to Dr. de Bakker (informing him that a complaint had been received from the Medical Ex-

ecutive Committee [peer review committee] regarding his gastroscopy privileges and his right to a hearing); (3) a letter from Dr. de Bakker to Sister Sylvia stating that he did not challenge St. Francis and did not request a hearing; and (4) depositions of Dr. de Bakker in other civil cases filed against him (containing answers regarding prior restriction and supervision of privileges by St. Francis).

Mrs. Herbstreith argues that this evidence does not come within the peer review privilege and was erroneously excluded.

St. Francis asserts that if we affirm the jury verdict, the peer review privilege issue becomes moot as to St. Francis because the jury found that Dr. de Bakker's departure from the standard of care did not cause Mrs. Herbstreith's injuries. The only claim Mrs. Herbstreith asserted against St. Francis related to negligent failure to restrict, suspend, or revoke Dr. de Bakker's surgical privileges. If Dr. de Bakker's departure from the standard of care did not cause Mrs. Herbstreith's injuries, there can be no causal connection between St. Francis' alleged negligence and Mrs. Herbstreith's injuries. This assertion has merit.

Dr. de Bakker does not address the applicability of the peer review statute. He states that the peer review privilege issue has been adequately discussed by St. Francis, the holder of the privilege. Dr. de Bakker argues that the excluded evidence relating to prior peer review is inadmissible against him regardless of the peer review privilege.

Mrs. Herbstreith states that the peer review evidence is admissible against Dr. de Bakker because it is relevant to his qualifications as a surgeon and to his credibility. Dr. de Bakker correctly points out that his qualifications as a surgeon were not in issue.

In the pretrial order, Mrs. Herbstreith advanced a series of contentions against Dr. de Bakker. None of the contentions related to his qualifications as a surgeon. Each contention was based on specific allegations of a departure from the standard of care in treating Mrs. Herbstreith. The pretrial order under K.S.A. 60-216 controls the course of the action unless modified to prevent manifest injustice. *Sampson v. Hunt,* 233 Kan. 572, 578, 665 P.2d 743 (1983). An issue or claim for relief that is not contained in the pretrial order should not be entertained by the trial court.

See *Kleibrink v. Missouri-Kansas-Texas Railroad Co.*, 224 Kan. 437, 442, 581 P.2d 372 (1978).

### Prior Deposition Testimony

Mrs. Herbstreith asserts that two depositions of Dr. de Bakker taken in other civil cases against him should be admissible because they go to Dr. de Bakker's credibility.

On September 8, 1986, Dr. de Bakker was deposed in *Reynolds v. de Bakker* (Sedgwick County District Court). In the *Reynolds* deposition, Dr. de Bakker testified that a medical procedure was questioned by the St. Francis surgical committee in 1968. His deposition revealed that in the early 1970s the surgical committee questioned his poor documentation of surgeries and discrepancies between his records and those of his residents. Dr. de Bakker admitted that on more than one occasion St. Francis' peer review committee concluded that he had performed unnecessary surgery. In 1983, the surgical committee restricted Dr. de Bakker and required second opinions on his surgeries. Also in 1983, Dr. de Bakker was reminded by the peer review committee to expand his endoscopy documentation. Similar problems of poor documentation occurred in 1986. He resigned his endoscopy privileges before the peer review committee acted. After his resignation, the committee suspended his endoscopy privileges.

In 1987, Dr. de Bakker testified in *Newton v. de Bakker* (Sedgwick County District Court). He stated that in the 1970s, St. Francis restricted him from doing major elective surgery without second opinions. Following that testimony, he was asked: "Q. Are there any other occasions in any hospital where your privileges were either restricted or suspended? A. No."

Dr. de Bakker did not disclose prior restrictions in *Newton*, which is contrary to his testimony in *Reynolds*. Mrs. Herbstreith contends that she should have been able to admit this prior deposition testimony to attack Dr. de Bakker's credibility.

K.S.A. 60-422(d) provides that evidence of specific instances of a witness' conduct, relevant only to prove a trait of character, is inadmissible as to the witness' credibility. Although K.S.A. 60-422(c) allows a witness' credibility to be attacked with evidence of traits of his or her character for honesty and veracity, such traits may be shown only by opinion or reputation evidence and

not by specific instances of the witness' conduct. *State v. Aldrich,* 232 Kan. 783, 783-84, 658 P.2d 1027, *cert. denied* 464 U.S. 819 (1983). The discrepancy in these two instances of testimony is evidence of specific instances of conduct and it is not admissible against Dr. de Bakker to attack his credibility.

Next Mrs. Herbstreith contends that the deposition evidence is admissible to impeach Dr. de Bakker as a prior inconsistent statement. However, she fails to identify a prior inconsistent statement made by Dr. de Bakker at trial.

Dr. de Bakker asserts that Mrs. Herbstreith attempted to introduce the deposition testimony hoping to challenge his character trait for skill and treatment of his patients by showing that his privileges had been restricted or suspended in the past. He correctly points out that evidence of specific instances of conduct, not constituting a conviction of a crime, is inadmissible to prove a trait of a person's character. K.S.A. 60-447. Likewise, any evidence offered to prove a trait of character with respect to care or skill is inadmissible under K.S.A. 60-448 as tending to prove the quality of conduct on a specified occasion. Other courts have rejected evidence designed to show prior episodes of malpractice. *Weil v. Seltzer,* 873 F.2d 1453 (D.C. Cir. 1989); *Jones v. Tranisi,* 212 Neb. 843, 326 N.W.2d 190 (1982) (negligence in 1980 cannot be proved with evidence that one was negligent on some earlier occasion).

The peer review evidence which was excluded was inadmissible against Dr. de Bakker independent of the peer review privilege. Furthermore, none of the evidence related to causation. The jury found that Dr. de Bakker's departure from the standard of care did not cause Mrs. Herbstreith's injuries. If Dr. de Bakker's negligence did not cause her injuries, the alleged negligence of St. Francis could not have done so. Consequently, we need not address the privilege issue of whether the excluded evidence was protected by K.S.A. 1990 Supp. 65-4915, the peer review privilege statute.

### The Peoria Hospitalization

One of Mrs. Herbstreith's experts, Dr. Moorstein, testified that she sustained an "enterocutaneous fistula or small bowel fistula." Dr. Moorstein also testified that this complication was directly

related to the prior surgery. When Dr. Moorstein was asked if he had an opinion whether Mrs. Herbstreith's Peoria medical problems were related to the treatment in Wichita, Dr. de Bakker objected. He based his objection on the grounds that the Moorstein opinion is based on information beyond that previously disclosed. The trial court sustained the objection.

Mrs. Herbstreith proffered Dr. Moorstein's testimony outside the presence of the jury. Dr. Moorstein testified that he reviewed the admission history and physical, the discharge summary, the operative note from the January admission, and the pathology report. He noted that Mrs. Herbstreith was treated for a small bowel fistula. Dr. Moorstein gave his opinion that the Peoria treatment was related to the treatment in Wichita. Dr. Moorstein stated: "She had been treated for a small bowel fistula previously in Wichita. She had a worsening of her condition and was seen in Peoria, Illinois, for the same process." On cross-examination, Dr. Moorstein was asked to read the following from his deposition with regard to what hospital records he had reviewed: "I believe, although I'm not going to—I can't recall this accurately, I believe I looked at discharge summaries and admission histories and physicals from hospitalizations in Peoria." At his deposition, Dr. Moorstein did not disclose that he had reviewed the operative report or the pathology report.

The trial court sustained Dr. de Bakker's objection to Dr. Moorstein's opinion testimony, stating:

"[F]rom what I hear there's really some question as to whether he wants to answer that question if it were put to him. And don't misunderstand how I say that because in what I have just heard it's pretty sketchy as to what he would have relied on for his information. You have had his opinion expressed on at least a half dozen occasions. I'm going to sustain the objection."

Mrs. Herbstreith argues that the trial court erred in excluding Dr. Moorstein's opinion, which would have laid the foundation to admit the Peoria hospital records and bills. She asserts that Dr. Moorstein clearly expressed his opinion. Mrs. Herbstreith contends that the trial judge's observation that what Dr. Moorstein would have relied upon was "pretty sketchy" goes to the credibility of the testimony, not its admissibility.

Dr. de Bakker argues that the trial court properly excluded the evidence on the basis of surprise. Dr. de Bakker relied upon Dr. Moorstein's deposition testimony. Dr. Moorstein stated in his deposition that although he could not recall accurately, he believed he reviewed "discharge summaries, admission histories, and physicals" from Peoria hospital records. Nothing in the deposition testimony disclosed to Dr. de Bakker that Dr. Moorstein would be offering expert testimony to lay a foundation for admission of such records and bills. Additionally, Dr. de Bakker asserts that Dr. Moorstein's proffered testimony relates only to damages, and the damages issue is irrelevant because the jury concluded that Dr. de Bakker's departure from the standard of care did not cause Mrs. Herbstreith's complications.

Dr. Moorstein testified that Mrs. Herbstreith suffered complications as a result of Dr. de Bakker's inappropriate decisions to operate on October 3 and October 8, 1986. These complications were necrosis, or infarction, of the small intestine and colon and a small bowel fistula. Mrs. Herbstreith was hospitalized and treated for these complications in Wichita from November 4, 1986, to December 29, 1986, and from January 11, 1987, to January 15, 1987. This evidence was before the jury. The jury concluded that these complications were not caused by Dr. de Bakker's breach of the standard of care.

Dr. Moorstein testified that the Peoria treatment was related to the treatment in Wichita, based on the fact that Mrs. Herbstreith had a fistula in Wichita and was seen in Peoria for a worsening of her condition. The jury found the prior Wichita fistula was not caused by Dr. de Bakker's departure from the standard of medical care; consequently, a worsening of the fistula also would not be caused by a departure from the standard of care.

The evidence regarding hospitalization and medical treatment in Peoria relates only to damages. Based on the jury's finding of no causation, there is no liability. Where the plaintiff in a medical malpractice action fails to convince the trier of fact that the defendant is liable, it becomes unnecessary for the trier of fact to resolve the issues of damages. Any error in the admission or exclusion of evidence relating to damages becomes immaterial. *Wisker v. Hart*, 244 Kan. 36, 47, 766 P.2d 168 (1988); *Patterson*

*v. Burt,* 213 Kan. 463, Syl. ¶ 2, 516 P.2d 975 (1973). The Peoria hospital records and bills were properly excluded.

## The St. Francis Counterclaim—Waiver of the
## Peer Review Privilege, K.S.A. 1990 Supp. 65-4915(b)

Dr. de Bakker testified that all hospital care provided, except routine bathing and bathroom assistance, was done pursuant to his order and that he took full responsibility for those orders. In Dr. de Bakker's opinion, all the hospital care given to Mrs. Herbstreith at St. Francis was necessary to carry out his orders. Mrs. Herbstreith testified that she needed all the hospital care she received at St. Francis.

Mrs. Herbstreith argues that St. Francis waived the peer review privilege when it advanced a counterclaim supported by Dr. de Bakker's testimony as an expert that the hospital care pursuant to his orders was necessary. Mrs. Herbstreith discusses the lawyer-client privilege, K.S.A. 60-426; the physician-patient privilege, K.S.A. 60-427; and the marital privilege, K.S.A. 60-428; and how they are waived.

St. Francis asserts: (1) the peer review privilege can be waived only as provided by statute; (2) neither K.S.A. 1990 Supp. 65-4915(b) nor any other statute provides for waiver under these facts; and (3) this court should not impose a common-law waiver.

K.S.A. 1990 Supp. 65-4915(b) provides when the privilege does not apply or is waived. That subsection begins: "Except as provided by K.S.A. 60-437 and amendments thereto and by subsections (c) and (d) . . . ." Subsections [c] and [d] do not apply to the case at bar.

K.S.A. 60-437 states:

"A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if the judge finds that such person or any other person while the holder of the privilege has (a) contracted with a party against whom the privilege is claimed that he or she would not claim the privilege or, (b) without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone."

St. Francis has neither contracted with Mrs. Herbstreith not to claim the privilege nor disclosed or consented to disclosure of

privileged peer review material. Thus, K.S.A. 60-437 is not applicable. St. Francis has not waived the privilege.

Furthermore, the statutes cited by Mrs. Herbstreith relating to attorney-client, physician-patient, and marital privileges demonstrate that the legislature knows how to provide a waiver of privilege when the holder puts a claim for services rendered in issue. The legislature has not done so with the peer review privilege. If a claim for services waiver of the peer review privilege is to be imposed, the legislature must impose it.

### The Directed Verdict

In ruling on a motion for a directed verdict, the trial court must resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions, the motion must be denied and the matter submitted to the jury. We apply the same rule on appeal. *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 (1987).

After Mrs. Herbstreith rested her case, the trial court granted a motion for directed verdict on the St. Francis counterclaim for unpaid medical bills. The trial court stated:

"Since the earlier presentation of the motion for a directed verdict was made, the Court has been watching for something that would take this beyond the position it originally presented itself in, and that was that the plaintiff had not presented evidence; and, therefore, I'm going to sustain the Motion for Directed Verdict."

Mrs. Herbstreith asserts that the trial court improperly placed the burden upon her to refute St. Francis' claim.

In the pretrial order, the parties stipulated that the hospital charges were St. Francis' usual and customary charges for the services rendered to Mrs. Herbstreith. Dr. de Bakker and Mrs. Herbstreith both testified that the hospital care was necessary. Dr. de Bakker took full responsibility for ordering that care. This was the only evidence regarding the St. Francis claim. St. Francis made a prima facie case. Mrs. Herbstreith offered no admissible evidence to the contrary. The trial court did not place the burden of proof on Mrs. Herbstreith to refute the claim until after the evidence relied on by St. Francis made a prima facie case. St.

Francis' evidence was uncontroverted. *Commercial Credit Corporation v. Harris,* 212 Kan. 310, 313, 510 P.2d 1322 (1973).

The trial court did not err in granting St. Francis' motion for a directed verdict.

### Dr. de Bakker's Office Records

Dr. de Bakker provided medical and surgical care for Mrs. Herbstreith from 1982 until she left Wichita after her discharge from the hospital in early 1987. Mrs. Herbstreith's claims in the case at bar relate solely to the medical treatment beginning in September 1986. Prior to trial, Dr. de Bakker filed a motion in limine requesting that Mrs. Herbstreith be prevented from attempting to allege or imply fault or negligence in any of these earlier hospitalizations or surgeries.

At the hearing on the motion in limine, Dr. de Bakker argued that Mrs. Herbstreith's claim should be tried on the facts of her case and not on collateral issues of alleged negligence in previous surgeries. Dr. de Bakker's counsel agreed, however, that any earlier records that are relevant could go to the jury. The trial court decided it would rule on the records when offered at trial after objection.

In her opening statement, Mrs. Herbstreith went into detail about Dr. de Bakker's prior treatment. She stated that in March 1984, Dr. de Bakker cut out a small portion of her colon and the radiological reports showed no evidence of diverticulitis. In January 1985, he performed a "coccygectomy for an allegedly broken tailbone." There were additional comments presumably designed to allege that other prior surgeries were inappropriate. Dr. de Bakker objected.

Following opening statements, Mrs. Herbstreith offered all of her prior records. Dr. de Bakker objected to their carte blanche admission and asked the court to make an individualized determination as to relevancy. The court again ruled that anything predating the September 1986 treatment at issue in the instant action should be offered individually and the court would rule on it at that time. The trial court reasoned that this would prevent unnecessary or undue prejudice and would maintain a balance of fairness.

Dr. de Bakker testified that information from earlier visits played a part in his thinking when he considered and diagnosed Mrs. Herbstreith's problems. Following this testimony, Mrs. Herbstreith attempted to introduce Dr. de Bakker's entire office chart going back to 1982. The court took the matter under advisement.

At the close of her case, Mrs. Herbstreith again offered Dr. de Bakker's office records in toto. The trial court again rejected the entire office record on the basis that no relevance had been shown. On the few occasions that Mrs. Herbstreith did segregate relevant records from Dr. de Bakker's office chart, they were admitted into evidence.

An evidentiary ruling on relevancy ordinarily rests in the sound discretion of the trial court. *Tucker v. Lower*, 200 Kan. 1, 6, 434 P.2d 320 (1967). The trial court acted within its discretion. The trial court refused to admit the entire medical office chart and required Mrs. Herbstreith to demonstrate relevancy item by item. No error has been shown.

### Discipline—The Kansas State Board of Healing Arts

On December 10, 1988, the Kansas State Board of Healing Arts (Board) entered an "Order of Emergency Limitation of License" restricting Dr. de Bakker's privilege to perform gynecological surgery. The Board entered the order ex parte after reviewing 20 gynecological surgery patient charts. The Board found, in general: (1) the history and physical examinations were inadequate to justify surgery; (2) the diagnostic impressions were unrelated to any information provided in the history and physical; (3) 3 of the 20 cases had post-operative bleeding, which is an excessive rate; (4) the licensee had a poor understanding of anatomy; and (5) the pathology report frequently did not support the diagnosis.

On February 11, 1989, the emergency order was rescinded, and a consent order was entered into which provided: (1) Dr. de Bakker would not perform major gynecological surgeries; (2) he would have a licensed physician surgical assistant at all abdominal surgeries; and (3) he would obtain second opinions on all major surgeries.

Dr. de Bakker filed a motion in limine to exclude this evidence, arguing that character evidence for traits of care or skill is inadmissible. The trial court excluded the evidence, ruling that the instant lawsuit should be tried on the basis of whether Dr. de Bakker committed malpractice at the times claimed.

Mrs. Herbstreith asserts the 1989 discipline evidence was relevant and admissible to explore the credibility of Dr. de Bakker's expert witness, Dr. Dillis Hart. Dr. de Bakker argues that the trial court excluded the evidence because it was prejudicial.

A trial judge has broad discretion to exclude relevant evidence where the judge finds its probative value is substantially outweighed by its prejudicial nature. *Van Hoozer v. Farmers Insurance Exchange*, 219 Kan. 595, Syl. ¶ 11, 549 P.2d 1354 (1976). In the present case, it is unclear whether prejudice formed the trial court's rationale for exclusion.

Nevertheless, the evidence was inadmissible as to the issue of credibility under K.S.A. 60-422. Evidence of specific instances of conduct relevant only to prove a trait of character is inadmissible. *State v. Aldrich*, 232 Kan. 783, 783-84, 658 P.2d 1027, *cert. denied* 464 U.S. 819 (1983).

The evidence regarding action taken by the Board two years after Mrs. Herbstreith's treatment was properly excluded.

### Cross-Examination of Mrs. Herbstreith

Mrs. Herbstreith complains that Dr. de Bakker was allowed to cross-examine her regarding her medical history as far back as 1965 while her counsel was not allowed to conduct redirect on the areas covered by Dr. de Bakker on cross-examination.

Prior to trial, Mrs. Herbstreith filed a motion in limine to exclude medical history regarding psychological treatment that she received between 1978 and the early 1980s. At the hearing on the motion, Dr. de Bakker argued that this medical history included complaints similar to these she now complains of and, consequently, it was relevant to her damages and her earnings history. The trial court ruled and counsel agreed that these impeaching facts were admissible, but reference to the psychological treatment should be avoided.

On direct examination, Mrs. Herbstreith testified that she still suffers from pain in her stomach, back, and legs, and from diar-

rhea and constipation. She also testified that she is too weak and tired to work.

On cross-examination, Dr. de Bakker went into Mrs. Herbstreith's previous medical history to show that she had suffered from these same complaints as far back as 1965. Mrs. Herbstreith's counsel did not object.

On redirect, Mrs. Herbstreith attempted to violate her own motion in limine by inquiring into psychological treatment. Dr. de Bakker objected. The trial court refused to allow her to violate the motion in limine.

The relevancy of testimony elicited by a party from a witness and the scope of both direct and cross-examination of that witness is subject to reasonable control by the trial court and rests in the discretion of the trial court. *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, 501, 665 P.2d 757 (1983).

The trial court did not abuse its discretion in limiting Mrs. Herbstreith's redirect examination. The trial court attempted to apply its ruling on the motion in limine in an impartial manner.

Affirmed.