(894 P.2d 881)
No. 70,410

THE ZENDA GRAIN & SUPPLY COMPANY, *Appellee/Cross-Appellant*, v. FARMLAND INDUSTRIES, INC., *Defendant*, and DOUBLE CIRCLE FARM SUPPLY COMPANY, *Appellant/Cross-Appellee*.

Opinion filed March 31, 1995.

*Lee M. Smithyman* and *David J. Roberts*, of Smithyman & Zakoura, Chartered, of Overland Park, for the appellant/cross-appellee.

*Calvin McMillan*, of Kaplan, McMillan & Harris, of Wichita, and *Theodore C. Geisert*, of Geisert, Wunsch & Watkins, of Kingman, for the appellee/cross-appellant.

Before PIERRON, P.J., GERNON and LEWIS, JJ.

LEWIS, J.: Zenda Grain & Supply Company (Zenda) sued Farmland Industries, Inc. (Farmland) and Double Circle Farm Supply Company (Double Circle) for breach of contract. The issues were submitted to a jury, which returned a verdict in favor of Zenda in the amount of $140,957.10. This verdict seems to have satisfied no one. Double Circle appeals, citing eight issues on which it believes the verdict should be reversed. Zenda cross-appeals, citing six issues in which it claims the trial court erred. Our obligation was to sort out what issues have merit and how they affect the verdict in this case. After doing so, we affirm in part, reverse in part, and remand for a new trial on the question of damages.

Zenda is a defunct farmers' cooperative headquartered in Zenda, Kansas. In the period from 1982 to 1987, Zenda was placed in jeopardy by a succession of losses in operations. It lost money each year of this period. In the aggregate, these losses exceeded $400,000, and Zenda's survival was threatened.

Either alone or prodded on by its bankers, Zenda sought outside help. Double Circle is a wholly owned subsidiary of Farmland. Double Circle had developed a contract management program designed to assist small cooperatives like Zenda in surviving the difficult conditions they faced in the 1980's.

In 1986, Zenda was on the verge of collapsing. Zenda attempted to do something positive by contacting Double Circle.

In September 1986, Zenda and Double Circle signed their first management agreement. This agreement basically turned over management of the cooperative to Double Circle. Initially, the agreement was to run from October 1, 1986, to March 1, 1988, and on a month-to-month basis thereafter. In addition, either party could terminate the agreement at any time by giving 60 days' notice. A new management agreement was entered into between the parties effective March 1, 1988, to March 1, 1989, and month to month thereafter. This second agreement remained in effect until terminated by Zenda in June 1989. Both management agreements were in writing.

During the time it managed Zenda, Double Circle provided the cooperative manager. Vincent Wilczek was the first such manager and continued in those duties until he was terminated by Double Circle in August 1988. Double Circle replaced Wilczek with Hubert Gudenkauf, who was later replaced by Dwayne Wilson. Wilson served as manager until he resigned in June 1989, just prior to the termination of the management agreement by Zenda.

For a variety of reasons, Double Circle's plans and policies were not successful at Zenda. Zenda made a profit on operations of $77,482.03 in fiscal year 1988 but otherwise continued to lose money.

One of Double Circle's obvious failures was in grain sales. Wilczek sold grain but allowed the sale to remain "uncovered" on the grain market for an inordinate length of time. This act of mismanagement caused a further loss of money by Zenda and, in all probability, led to Wilczek's being fired by Double Circle in the summer of 1988.

Zenda never saw another profitable year after fiscal year 1988. From the end of fiscal year 1988 to November 1989, Zenda suffered massive losses and ultimately was forced to liquidate by selling its assets to another cooperative.

At some point, Zenda decided to blame Double Circle for its losses and for its ultimate liquidation. It sued Double Circle and Farmland for breach of contract and mismanagement. The trial court refused to pierce the corporate veil insofar as Double Circle and Farmland were concerned, and Farmland was dismissed as a party and is no longer relevant to this lawsuit.

This case was finally tried to a jury, which returned the verdict noted above. It was very vigorously tried and contested by both sides. The record is enormous, at times confusing, and often bitter. This lawsuit has consumed much time and money and an inordinate amount of effort by both sides. The fact that after such a Herculean effort neither side is happy says volumes about why and how we have arrived at this point. We will cover additional facts where they are pertinent to the issues.

## HOLD HARMLESS CLAUSE

The second written management agreement between the parties contains the following provision:

"The ASSOCIATION agrees to indemnify, protect and save MANAGER and DOUBLE CIRCLE harmless from and against any and all claims, actions, loss or damages, including reasonable attorney's fees, arising in any way on account of this agreement or services performed thereunder in the operation of AS-SOCIATION'S business."

Double Circle contends that the "hold harmless" clause protects them from liability and that Zenda cannot maintain the action against it. The trial court disagreed with Double Circle and said:

"Accordingly, the Court concludes that Section Eight is overbroad and unspecific and does not show a clear unequivocal intention to waive the type of Double Circle conduct that Zenda complains of in its Petition herein. The Court preemptively rules that the Section Eight Hold Harmless Clause is not a defense to Plaintiff's cause of action. Therefore, the Court will not instruct the Jury as to a hold harmless defense."

Double Circle argues on appeal that the trial court erred in failing to enforce the hold harmless clause in its favor. We disagree.

Stripped to its bare essentials, Double Circle's argument is that it is protected contractually from liability for any mismanagement or breach of contract. The type of clause which Double Circle asserts protects it from the consequences of its own negligence is not a favorite of the law and is rarely enforced to protect a party from its own negligent or other wrongful actions:

"While it is true that the policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced and that contracts freely arrived at and fairly made are favorites of the law [citations omitted], effective disclaimer of liability for one's own negligence, waiver of liability of the other party for the latter's negligence, or indemnification of the other party for its negligence is subject to strict construction and explicit expression." *Elite Professionals, Inc. v. Carrier Corp.*, 16 Kan. App. 2d 625, 634, 827 P.2d 1195 (1992).

"Contracts for exemption from liability for negligence are not favored by the law and are strictly construed against the party relying on them." *Cason v. Geis Irrigation Co.*, 211 Kan. 406,

Syl. ¶ 1, 507 P.2d 295 (1973). "Exculpation of liability for one's own negligence is subject to strict construction and expression by clear and unequivocal language." *Elite Professionals,* 16 Kan. App. 2d 625, Syl. ¶ 3.

One of the leading cases in this area is *Butters v. Consolidated Transfer & Warehouse Co., Inc.,* 212 Kan. 284, 510 P.2d 1269 (1973). That case involved a hold harmless clause that read as follows:

" 'The Contractor agrees to hold the City harmless from any and all claims or liability for bodily injury, death and property damage to Contractor, his employees, agents, servants, and third parties, while engaged in the performance of this contract.

" 'The Contractor shall carry Workmen's Compensation Insurance during the performance of this contract, all in accordance with the laws of the State of Missouri and further agrees to carry Employer's Liability and Public Liability Insurance in the amount of $1,500,000.00 combined single limit for any one occurrence.' " 212 Kan. at 285.

The Supreme Court found that this clause was unenforceable:

"It is a general rule that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed thereto, and mere general broad and seemingly all-inclusive language in the indemnifying agreement is not sufficient to impose liability for the indemnitee's own negligence." 212 Kan. 284, Syl. ¶ 2.

The court went on to say that "[t]he indemnity or 'hold harmless' agreement does not show an intention to indemnify the indemnitee against loss resulting from its own negligent acts *expressed in clear and unequivocal terms,* or even necessarily indicate it." (Emphasis added.) 212 Kan. at 291. We note the similarity between the clause in *Butters* and the one in the instant matter and attach significance to that similarity.

Double Circle relies on the decision in *Bartlett v. Davis Corporation,* 219 Kan. 148, Syl. ¶ 4, 547 P.2d 800 (1976). In that case, Davis owned the land on which a sand pit was located. It leased the sand pit to Heersche, who operated and exclusively controlled the area surrounding and including the sand pit. In the lease, Heersche agreed to "hold 'Davis harmless' from liability." Two young boys drowned in the pit owned by Davis and

controlled by Heersche. A judgment was rendered against those two jointly, and Davis sought indemnity from Heersche under the "hold harmless" clause. The Supreme Court enforced the clause in that case while recognizing the general rule against the enforceability of such a provision.

In our judgment, *Bartlett* is of little assistance to Double Circle. *Bartlett* is explained by the following language in the opinion: "Where the indemnitor has possession and control of the work of premises and the owner does not maintain independent operations of the premises, a contract of indemnity is generally construed to cover *passive negligence* of the owner." (Emphasis added.) 219 Kan. at 158. *Bartlett* stands for the proposition that a party may protect itself from the results of its own passive negligence where it has no control over the operations or the premises on which the incident took place. In *Bartlett*, Davis had no way of protecting himself from the negligence of Heersche.

In this case, Double Circle seeks to be relieved of the consequences of its own active negligence and malfeasance. This is not a case controlled by *Bartlett*; it is a case controlled by *Butters*. In our judgment, a conclusion that the parties in this case intended to relieve Double Circle from responsibility for its own negligence or mismanagement would reduce the contract to a nullity. It would mean that Zenda agreed to pay for a service without any way of requiring that the service be performed in a professional and satisfactory manner. There is nothing in the hold harmless clause in this case which expresses in clear and unequivocal terms an intent to shield Double Circle from the responsibility for its own negligence and mismanagement. Under these circumstances, the rationale of *Butters* controls.

We are not suggesting that under no circumstances may a party contract away responsibility for its own negligence. It can be done and it has been done but only in clear and unequivocal terms. In *Corral v. Rollins Protective Services Co.*, 240 Kan. 678, 680-81, 732 P.2d 1260 (1987), the hold harmless clause read as follows:

" 'It is further agreed that Rollins is not an insurer of the Customer's property and that all charges and fees herein provided for are based solely on the cost

of installation, service of the System and scope of liability hereinafter set forth and are unrelated to the value of the Customer's property or the property of others located on the Customer's premises.

" 'The parties agree that if loss or damage should result from the failure of performance or operation or *from defective performance or operation or from improper installation or servicing of the System,* that Rollins' liability, if any, for the loss or damage thus sustained shall be limited to a sum equal to ten (10%) per cent of one year's service charge or $250.00, whichever sum is the greater, and that the provisions of this paragraph shall apply if loss or damage, irrespective of cause or origin, results, directly or indirectly to persons or property from performance or nonperformance of obligations imposed by this Agreement *or from negligence, active or otherwise, of Rollins, its agents or employees.' "* (Emphasis added.)

The Supreme Court enforced that clause as written. In *Elite Professionals, Inc. v. Carrier Corp.*, 16 Kan. App. 2d at 635, we commented on the hold harmless clause in *Corral*:

"In *Corral,* as previously observed, within the parties' agreement it was provided that " '[t]he parties agree that if loss or damage should result from the failure of performance or operation . . . of the [Rollins] system, that Rollins' liability, if any, for the loss or damage thus sustained shall be limited . . . and that *the provisions of this paragraph shall apply if loss or damage . . . results . . . from negligence . . . of Rollins, its agents or employees.' "* (Emphasis added.) 240 Kan. at 680-81. That, in our view, is a clear and unequivocal expression of exemption from liability for negligence. It is a statement of exculpatory purpose beyond any peradventure of a doubt. No comparable clear and unequivocal language appears in the printed warranty and disclaimer here involved."

We conclude that in order to protect itself from its own negligence, malfeasance, or mismanagement, an entity must employ language similar to the clause in *Corral.* Those drafting hold harmless clauses in the future should look to that language and follow it carefully. The type of language employed in the instant matter is not nearly as clear and unequivocal. We suspect the purpose of the clause was to shift some responsibility as to liability to third parties. The clause might be sufficient to accomplish that task. However, it does not relieve Double Circle from responsibility for its own acts of negligence and mismanagement in clear and unequivocal language. We hold that the trial court did not err in its ruling on the hold harmless clause in the instant matter.

## IMPLIED WARRANTY OF WORKMANLIKE PERFORMANCE

For reasons which are not entirely clear, Zenda chose not to base its lawsuit on an express breach of contract. Rather than claiming that Double Circle had breached any express provision of the management agreement, Zenda chose to predicate liability on the basis of a breach of an implied warranty of workmanlike performance. No provision of the written management agreement between the parties required Double Circle to perform its management services in a workmanlike manner. The warranty allegedly breached is not in writing. Zenda relies on the breach of a warranty which it says was "implied" into the agreement by operation of law.

Double Circle argues that under the facts shown, no implied warranty of workmanlike performance can exist or be implied. It argues that the trial court erred in concluding that such a warranty existed. We do not agree.

The trial court, in holding that an implied warranty of workmanlike performance did exist in this case, said:

"The Court does not agree with Defendants' position that Double Circle had very minimal obligations to oversee the Coop managers *they* hired and placed in the Coop pursuant to the Coop Management Agreement dated January 19, 1988. The Court believes that the Defendants had a duty to adequately supervise *their employee,* the Coop manager, and that they had a duty to provide management in an overall competent, honest and workmanlike manner. Coop managers placed at Zenda Coop pursuant to the Cooperative Management Agreement of January 19, 1988, were interviewed, hired, supervised and paid by the Defendant Double Circle. That manager was, in the Court's opinion, an employee of Double Circle, not an employee of the Coop. To view Defendants' obligation in any lesser light would result in the Coop receiving virtually nothing from the Defendants in return for payment of significant management fees. While Plaintiff has not seriously argued lack of consideration for the contract, if the Court were to adopt Defendants' view as to their minimal obligations to perform under the contract, the Court believes a lack of consideration would be a viable issue in this case. It is the Court's point of view that the Defendant Double Circle, took on significant duties and obligations of workmanlike performance under the contract. Whether they properly performed these duties is up to a Jury to decide. The Court will not, however, (by overly technical construction of the contract provisions) vitiate or nullify Double Circle's obligation to competently, honestly and in a workmanlike manner perform the subject

contract. *The 'workmanlike' performance duty may be an 'implied duty' under Kansas law, but the Court views it as a significant duty.*

"The Plaintiff contracted with Defendant Double Circle to provide managerial services. Section Two of the Cooperative Management Agreement of January 19, 1988, grants Defendant Double Circle *'sole* authority and discretion to appoint and remove' the Double Circle employee designated 'Manager' of the Coop. The Defendants cannot insulate and isolate themselves circularly and totally from the duty to provide management services in a competent, honest, workmanlike manner to Plaintiff. If the Double Circle employee (manager) was not competent, acted illegally, or contrary to Coop policy, Double Circle *may* have breached its contractual duties. (See also Section One and Section Nine regarding 'management' duties of Double Circle or provisions regarding 'managers'.)" (Emphasis added.)

Although the trial court suggests that Double Circle may also have breached either section one or nine of the agreement, the liability of Double Circle went to the jury on the theory of a breach of an implied warranty of workmanlike performance. The jury, however, was not instructed on the theory of express breach of contract.

Whether the trial court erred in implying a warranty of workmanlike performance is a question of law. "When determining a question of law, this court is not bound by the decision of the district court." *Memorial Hospital Ass'n, Inc. v. Knutson,* 239 Kan. 663, 668, 722 P.2d 1093 (1986). Our review of a conclusion of law is unlimited. *Gillespie v. Seymour,* 250 Kan. 123, 129, 823 P.2d 782 (1991).

"Express warranties are those for which a party bargained; they go to the essence of the bargain, being a part of its basis, and are contractual, having been created during the bargaining process. Implied warranties arise by operation of law and not by agreement of the parties, their purpose being to protect a party from loss where the subject matter of the contract, though not violating an express promise, fails to conform to the normal commercial standard or meet the party's known particular purpose." *Corral v. Rollins Protective Services Co.,* 240 Kan. 678, Syl. ¶ 6.

"[T]his court has been consistent in holding that where a person contracts to perform work or to render a service, without express warranty, the law will imply an undertaking or contract on his part to do the job in a workmanlike manner and to exercise reasonable care in doing the work. (*Crabb v. Swindler, Administratrix,* 184 Kan. 501, 337 P.2d 986.)

"Where negligence on the part of the contractor results in a breach of the implied warranty, the breach may be tortious in origin, but it also gives rise to

a cause of action *ex contractu*. An action in tort may likewise be available to the contractee and he may proceed against the contractor either in tort or in contract; or he may proceed on both theories. (*Nichols v. Nold*, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887.)" *Gilley v. Farmer*, 207 Kan. 536, 542, 485 P.2d 1284 (1971).

The implied warranty of workmanlike performance does not arise from a sale transaction, and resort to the Uniform Commercial Code is neither indicated nor helpful. See *Corral v. Rollins Protective Services Co.*, 240 Kan. at 698. The warranty with which we now deal has nothing to do with the Uniform Commercial Code but is implied by operation of law. Although implied warranties are occasionally referred to as "promises," they are not promises at all. An express warranty is a promise; an implied warranty is imposed upon the parties by operation of law and is only consensual in the most liberal use of that term. See, *e.g.*, 17A Am. Jur. 2d, Contracts § 627, pp. 636-37.

The law in Kansas and, indeed, the general rule throughout the United States is that there is "implied in every contract for work or services a duty to perform it skillfully, carefully, diligently, and in a workmanlike manner." 17A Am. Jur. 2d, Contracts § 627, p. 636; *Crabb v. Swindler, Administratrix*, 184 Kan. 501, 337 P.2d 986 (1959).

The agreement in this case is one for management services. There is no reason why it should not be implied that management services be performed skillfully, carefully, diligently, and in a workmanlike manner. Double Circle argues that the services performed under the management agreement cannot be held subject to implied warranties. It suggests that management services are akin to professional services provided by doctors and lawyers and, thus, are not subject to the implied warranty of workmanlike performance. It relies on *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 552 P.2d 885 (1976), and *Tamarac Dev. Co. v. Delamater, Freund & Assocs.*, 234 Kan. 618, 675 P.2d 361 (1984), to support its argument.

Although we find it difficult to reach any conclusion on the subject in reading *Malone*, the Supreme Court amplified the meaning of that opinion in *Tamarac Dev. Co.*, 234 Kan. at 622:

"Based on our decision in *Malone v. University of Kansas Medical Center,* 220 Kan. 371, it can be said certain professionals, such as doctors and lawyers, are not subject to such an implied warranty. However, an architect and an engineer stand in much different posture as to insuring a given result than does a doctor or lawyer. The work performed by architects and engineers is an exact science; that performed by doctors and lawyers is not. A person who contracts with an architect or engineer for a building of a certain size and elevation has a right to expect an exact result. [Citation omitted.] The duty of the architect is so strong and inherent in the task, we hold it gives rise to an implied warranty of workmanlike performance. An injured party under these circumstances may choose his remedy from express contract (if applicable), implied warranty or negligence."

We disagree with Double Circle's assertion that management services are akin to professional services and not subject to implied warranties of workmanlike performance. The breach of this warranty is basically tortious in nature and is shown by proof of negligence and mismanagement. We conclude that management skills may be expected to be performed skillfully and in a workmanlike manner. Kansas decisions have been rather liberal in finding that an implied warranty of workmanlike performance existed in various agreements calling for the performance of work or skill. In support of that statement, we cite the following decisions:

- Installation and service of fire and burglary alarm systems— *Corral v. Rollins Protective Services Co.,* 240 Kan. 678, Syl. ¶ 6.
- Engineering and architecture—*Tamarac Dev. Co. v. Delamater, Freund & Assocs.,* 234 Kan. 618.
- Building contractors and subcontractors—*Ware v. Christenberry,* 7 Kan. App. 2d 1, 637 P.2d 452 (1981).
- Insurance investigation and claims handling—*Gilley v. Farmer,* 207 Kan. 536.
- Plumbing contractor—*Crabb v. Swindler, Administratrix,* 184 Kan. 501.

We reject Double Circle's argument that management services cannot be subjected to an implied warranty of workmanlike performance. We hold that a contract providing for management

services is subject to an implied warranty of workmanlike performance and must be performed skillfully, carefully, diligently, and in a workmanlike manner. We affirm the holding of the trial court on this issue.

## STATUTE OF LIMITATIONS

Perhaps the most substantial issue in this lawsuit is whether the action is subject to a statute of limitations of three or five years. Double Circle argues that the statute of limitations applicable to an action based on an implied warranty of workmanlike performance is the three-year statute under K.S.A. 60-512. Zenda argues that its action is based upon a written agreement and that the five-year period provided by K.S.A. 60-511 is applicable. The trial court agreed with Zenda and applied a five-year statute of limitations.

The parties' relationship began on September 23, 1986, and was terminated on June 2, 1989. The instant lawsuit was filed on August 2, 1991. If the statute of limitations is a three-year statute, some of Zenda's claims may well be barred.

K.S.A. 60-511 provides in relevant part: "The following actions shall be brought within five (5) years: (1) An action upon any agreement, contract or promise in writing."

K.S.A. 60-512 provides a three-year statute of limitations and reads in part as follows: "The following actions shall be brought within three (3) years: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in writing."

The trial court applied the five-year statute of limitations on the theory that Zenda's action was based upon a written agreement. The cornerstone of that decision is the trial court's conclusion that "[t]he limiting words in K.S.A. 60-512 are the words 'not in writing.' If the basic contract giving rise to the breach of contract claim is in writing, then K.S.A. 60-512 does not apply." However, the fact is that the implied warranty of workmanlike performance on which Zenda based its lawsuit cannot be found in the parties' written agreements. The warranty of workmanlike performance was implied into the parties' agreement by operation of law. It is a legal fiction that an implied warranty of workmanlike

performance is an express provision of the written agreement in this case. It is not to be found in the writing to which these parties reduced their agreement. The trial court resolved this conundrum by citing language from other decisions which adopt the rule stated in *Steele v. Latimer*, 214 Kan. 329, 336, 521 P.2d 304 (1974), as follows:

" 'It is a general rule that contracting parties are presumed to contract in reference to the existing law; indeed, they are presumed to have in mind all the existing laws relating to the contract, or to the subject matter thereof. *Thus, it is commonly said that all existing applicable or relevant and valid statutes, ordinances, regulations, and settled law of the land at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein,* except where the contract discloses a contrary intention.' "

This rule is also stated in *Cairo Cooperative Exchange v. First Nat'l Bank of Cunningham*, 228 Kan. 613, Syl. ¶ 2, 620 P.2d 805 (1980), *modified* 229 Kan. 184, 624 P.2d 420 (1981). Indeed, it is *Cairo* on which the trial court primarily relied in making its decision that the five-year statute of limitations was applicable.

As a general proposition, it seems to us that if the rationale utilized in *Steele* and quoted above is applied in the context of the statute of limitations, K.S.A. 60-511 becomes virtually meaningless. If the contents of every statute, ordinance, regulation, and court decision are implied into every contract, oral or written, then there is little reason to reduce the agreement to writing. Followed to its extremes, a one-paragraph written agreement which identifies the parties and the subject matter of the contract would then have implied into it all manner of covenants, warranties, etc., by operation of law. In addition, all of these absent, fictionalized provisions would be considered to be an express part of the agreement and could be sued upon to the same extent and under the same statute of limitations as if they were written down in the agreement between the parties. If that is the law, then any writing, no matter how brief, is subject to K.S.A. 60-511, and we know that this is not correct.

None of the cases relied upon by Zenda and the trial court involved the issue of the statute of limitations. *Steele v. Latimer*

dealt with implying a warranty of habitability into an *oral lease.* It cannot be relied upon as an authority on a statute of limitations issue involving a document that was at least partially in writing. In *Cairo*, the question was whether there was an implied contract between the parties concerning the honoring of restrictive endorsements. Although *Cairo* adopts the sweeping statements of *Steele v. Latimer*, it does not do so in the context of the statute of limitations. Indeed, the issue of the statute of limitations was not involved in the *Cairo* decision. For those reasons, we do not consider either *Steele* or *Cairo* to be authoritative on the issue presently being considered.

What we are dealing with here is basically a fiction invented by the courts. There is no express agreement between these parties dealing with the obligation to perform work skillfully, carefully, diligently, and in a workmanlike manner. There is no such provision in the agreement. The implied warranty of workmanlike performance is imposed upon parties by operation of law. It is not consensual and has nothing whatsoever to do with the agreement which the parties reduced to writing. It arises because the parties have an agreement involving the performance of work or delivery of services. It would arise regardless of whether the basic agreement was entirely oral or entirely in writing, or a combination of the two. The fact is, although the courts indicate that an implied warranty of workmanlike performance is treated as if it were an express provision of the contract, it is not and never was.

We conclude that logically and by the authorities we have found, K.S.A. 60-512 applies to any cause of action based upon an *implied warranty of workmanlike performance.* The statute applies to "all contracts, obligations, or liabilities expressed or implied but not in writing." Any implied warranty, by its very definition, is an implied obligation or liability which is not in writing. If it were in writing, we would not call it an implied warranty, we would call it an express warranty. If a warranty of workmanlike performance was promissory in nature and part of an oral agreement, it would be an express warranty. It is only when the parties have not included a specific warranty either in their written agree-

ment or as a term of their oral agreement that we *imply* its existence. To conclude that 60-512 cannot apply in this case because the parties reduced their agreement to writing simply ignores the fact that the written agreement between the parties does not contain an implied warranty of workmanlike performance and its existence is a purely legal fiction.

The trial court's decision was contrary to some appellate decisions in this state. "The cause of action for breach of implied warranty has a three-year statute of limitations pursuant to K.S.A. 60-512." *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 332, 582 P2d 1111 (1978). "An action sounding in contract for breach of an implied warranty is governed by K.S.A. 60-512 and the time, for purposes of the application of the statute of limitations, begins to run with the breach of the contract, regardless of whether the injured party is aware of the breach." *Ware v. Christenberry*, 7 Kan. App. 2d 1, Syl. ¶ 1.

The trial court expresses a concern about the fact that the parties had a written agreement and that K.S.A. 60-512 cannot apply to a written agreement. That concern is negated by the fact that the cause of action in this case is not based on any express provision of the written agreement. The implied warranty of workmanlike performance arises because the parties had an agreement, and it is basically irrelevant whether that agreement was in writing or entirely oral.

In 51 Am. Jur. 2d, Limitations of Actions § 94, p. 670, it is stated: "Quasi contracts or liabilities imported into an agreement from some external source are not within a statute prescribing a period of limitations for actions 'upon a contract in writing, or liability express or implied arising out of a written agreement.'"

In the final analysis, we believe this issue is controlled by *Chilson v. Capital Bank of Miami*, 10 Kan. App. 2d 111, 692 P.2d 406 (1984), *aff'd* 237 Kan. 442, 701 P.2d 903 (1985). In that case, a suit was filed by one bank to recover on an endorsement guaranteed by another bank. The endorsement was more than three years old, and the bank sought to rely on a written warranty from the letters P.E.G. stamped on the back of the check. We held that the five-year statute did not apply.

"The difficulty with Merchants' argument is that in order for the P.E.G. stamp to have any meaning in light of the absence of an endorsement, *reference must be made to the obligations implied at law by the U.C.C. The stamp does not say that prior and missing endorsements are guaranteed and plaintiff cites no authority from this state which would imply such a meaning to a P.E.G. stamp.* To the contrary, plaintiff relies *entirely on the provisions of the U.C.C. defining the warranties implied by law, to give force to the words stamped on the check as an independently enforceable contract. Such a writing is insufficient to establish all essential contract terms or qualify for application of a five-year statute of limitations.*" (Emphasis added.) 10 Kan. App. 2d at 113.

In the syllabus of *Chilson,* we said in part:

"A written agreement, contract or promise in writing which falls within the five-year statute of limitations, K.S.A. 60-511(1), must contain all its material terms in writing." Syl. ¶ 1.

"A writing which is dependent upon statutorily implied warranties to state the promise allegedly breached fails to state all of the terms of the contract in writing." Syl. ¶ 3.

"An action for breach of warranty which depends upon rights and obligations imposed by statute to state the terms of the warranty is not in the nature of an action on a writing even though the warranty may be partly stated in writing." Syl. ¶ 4.

The settled law of this state is that a written agreement must contain all the material terms in writing to fall within the five-year statute of limitations. *Miller v. William A. Smith Constructing Co.,* 226 Kan. 172, 174, 603 P.2d 602 (1979). *Chilson* merely extends this rule by holding that "[a] writing which is dependent upon statutorily implied warranties to state the promise allegedly breached fails to state all of the terms of the contract in writing." 10 Kan. App. 2d 111, Syl. ¶ 3. Thus, such a contract does not contain all its material terms in writing and does not fall within the provisions of K.S.A. 60-511. The fact that the warranty in this case is implied by court-made law and not statutory law is a distinction without any relevance.

We adopt the philosophy expressed in *Chilson.* The promise allegedly breached in this case was one implied by law. The implied warranty of workmanlike performance was not a part of the written agreement between the parties except in a philosophical sense of the term. This cause of action was controlled by the three-year statute of limitations because it is based on an external source and not on an express provision of the written agreement.

Our conclusion obviously requires us to reverse the verdict on damages. It is not appropriate for us to determine from the cold record what items of damages survive our decision. On remand, the trial court should isolate, if possible, those portions of the jury's award which are obviously within the three-year statute of limitations. As to the other damages awarded by the jury which are affected in whole or in part by our decision, we order a new trial on the question of damages; at that time the trial court will have to determine what, if any, portions of the remaining claims are time barred.

## ESTOPPEL

Double Circle moved for summary judgment on the theory that Zenda had waived any breach of contract. The motion was denied. Double Circle contends this was error.

The basis for the estoppel argument is that Zenda continued to renew the agreement after it knew of breaches by Double Circle. Specifically, the management agreement between the parties expired by its own terms on March 1, 1989, and continued on a month-to-month basis thereafter until it was terminated by Zenda in June 1989. Double Circle points out that Zenda became aware of the Triple C Land Feeder Association and of the grain imbalance prior to July 1988 but continued with the agreement despite such knowledge. Double Circle argues that Zenda's failure to terminate the agreement after it learned of these breaches results in Zenda being estopped to raise the issue in this action.

The trial court denied the motion for summary judgment, saying: "The Court concludes that with regard to the 'waiver' defense alleged by Defendants there are sufficient controverted facts to merit denial of summary judgment. It will be necessary for a Jury to decide whether a 'waiver' defense is applicable herein."

Our standard of review on a motion for summary judgment is well known. See *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994). "When a summary judgment is challenged on appeal, an appellate court must read the record in the light most favorable to the party who defended against the motion for summary judgment." *Patterson v. Brouhard*, 246 Kan. 700, 702, 792 P.2d 983 (1990).

Double Circle basically argues that Zenda waived its right to recover by continuing the contract after it knew of breaches.

"Waiver in contract law implies that a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. [Citations omitted.] Once it has been established that a contractual right has been waived, a party possessing the contractual right is precluded from asserting it in a court of law. [Citation omitted.]" *Iola State Bank v. Biggs*, 233 Kan. 450, 458-59, 662 P.2d 563 (1983).

"Waiver is consensual in nature but the intention may be inferred from conduct and the knowledge may be actual or constructive." *City of Wamego v. L. R. Foy Constr. Co.*, 9 Kan. App. 2d 168, Syl. ¶ 3, 675 P.2d 912, *rev. denied* 234 Kan. 1076 (1984). "'The intent to waive known rights is essential.'" *Stratmann v. Stratmann*, 6 Kan. App. 2d 403, 410, 628 P.2d 1080 (1981).

"A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties." *Ruebke v. Globe Communication Corp.*, 241 Kan. 595, 605, 738 P.2d 1246 (1987).

Guided by the authorities cited above, we conclude the trial court did not err in denying Double Circle's motion for summary judgment. Although Double Circle states that "[i]t is uncontroverted that Zenda became aware of the Triple C Lamb Feeders situation and of the grain imbalances prior to July, 1988," there is no citation to the record to support this assertion. Supreme Court Rule 6.02(d) (1994 Kan. Ct. R. Annot. 29) states that "[t]he facts stated [in appellant's brief] shall be keyed to the record on appeal so as to make verification reasonably convenient. *Any material statement made without such a reference may be presumed to be without support in the record.*" (Emphasis added.) This rule has been applied precisely as it is written. *McCaffree Financial Corp. v. Nunnick*, 18 Kan. App. 2d 40, 48, 847 P.2d 1321 (1993). Accordingly, we conclude that the assertion by Double Circle is without support in the record. In addition, Zenda denies the allegation.

Our standard of review requires that we review the record in favor of Zenda and, in so doing, we conclude the trial court did

not err in denying summary judgment on the basis stated. The issue was properly presented to the jury, and the jury, based on all the evidence, found that no such waiver existed. We affirm that finding.

## ARTICLES OF INCORPORATION

Double Circle sought to show that Zenda retained control over the management of its business and could have fired the Double Circle manager had it chosen to do so. To this end, Double Circle sought to have admitted in evidence Zenda's articles of incorporation, bylaws, and board policy. The trial judge excluded this evidence, ruling:

"I think it is going to serve to misdirect and confuse the jury's deliberations with regard to whether or not the cooperative management agreement was breached. I think we can instruct them properly and then counsel have leeway to argue with regard to the documents and the exhibits. I believe that Defendant's 501 has the potential for confusing the jury, that it has minimal if any relevancy or materiality to the breach of contract question and that it confuses issues of nondelegability, which I've already ruled on right or wrong. Either I'm right or I'm wrong on that, but I'm really concerned that this document is— has the likelihood for confusing the jury and so I intend to reverse myself as to 501. I'm going to refuse admission of that at this time and I'm going to give the jury a cautionary instruction about that first thing this morning."

Double Circle argues on appeal that the trial court's ruling was reversible error. "An evidentiary ruling on relevancy ordinarily rests in the sound discretion of the trial court." *Herbstreith v. de Bakker*, 249 Kan. 67, 83, 815 P.2d 102 (1991). "A trial judge has broad discretion to exclude relevant evidence where the judge finds its probative value is substantially outweighed by its prejudicial nature." 249 Kan. at 84.

The issue was whether Double Circle breached the cooperative management agreement. Double Circle's strategy at trial, insofar as the articles of incorporation, bylaws, and board policies were concerned, was directed at demonstrating the obligation of the board to set salary, hire, fire, and supervise managers. The trial court, however, ruled that the nondelegability doctrine was not a defense available to Double Circle. It concluded that the management agreement altered the relationship between Zenda and

its manager. It further ruled that such an alteration of relationship was proper. We agree with those decisions of the trial court.

There was no issue concerning Zenda's obligation to supervise and control its manager. In the absence of such an issue, the articles, bylaws, and board policies would only have confused and misled the jury.

We hold that the trial court did not err by excluding the articles of incorporation, bylaws, and board policies from evidence.

## LOST PROFITS

The jury awarded Zenda damages for loss of profits in 1989 in the amount of $78,130.54 and $11,919.18 for 1990. We cannot, at this time, predict the impact of our decision on the statute of limitations on the award for lost profits, and those awards must be reversed and remanded. However, it is the position of Double Circle that it was error to submit loss of profits to the jury at all because the evidence was too speculative. This issue will be important on remand and, for that reason, we will address it.

"Loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties." *Vickers v. Wichita State University,* 213 Kan. 614, Syl. ¶ 1, 518 P.2d 512 (1974). "The fact damages cannot be calculated with absolute exactness will not render them so uncertain as to preclude an assessment." 213 Kan. 614, Syl. ¶ 2. "Evidence necessary in establishing loss of future profits with reasonable certainty is dependent upon the facts and circumstances of the particular case." 213 Kan. 614, Syl. ¶ 3.

Double Circle's basic argument is that because Zenda lost money for each of the five years previous to the management agreement, the issue of loss of profits was too speculative to submit to the jury.

"Evidence of past profitability is not the sole method of showing lost profits. In weighing the evidence presented, the court should view each case individually and pragmatically, and require the best proof available as to the amount of loss sustained." *Butler*

*v. Westgate State Bank*, 226 Kan. 581, Syl. ¶ 2, 602 P.2d 1276 (1979).

"As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. [Citation omitted.] It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury. [Citation omitted.]" *Vickers v. Wichita State University*, 213 Kan. at 620.

The Supreme Court has indicated that "[t]he purpose of awarding damages is to make the injured party whole." *Gillespie v. Seymour*, 250 Kan. 123, Syl. ¶ 8, 823 P.2d 782 (1991). We have said that "[w]here the cause and existence of damages are established with requisite certainty, recovery will not be denied because the damages are difficult to ascertain. In such cases, evidence which establishes the extent of damages as a matter of just and reasonable inference is sufficient." *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 852, Syl. ¶ 2, 844 P.2d 768 (1993).

These decisions indicate an emphasis on making an injured party whole and a rather liberal approach to what evidence is required to do so. We examine this case in the light of that express policy and our standard of review and conclude that the trial court did not err in permitting the jury to consider the question of loss of profits.

Double Circle argues that loss of profits was not within the contemplation of the parties. They point to the first management agreement between the parties, which provided that Double Circle agreed to pay Zenda 10 percent of any losses sustained by Zenda, limited to the amount of fees received under the agreement. This particular provision, however, was not in the 1988 management agreement.

Double Circle's argument implies that the 10 percent provision in the first management agreement was a liquidated damages clause. We hold that it was not. The clause was entitled "Management Fees." The clause provided that if Zenda made a profit beyond projections, Double Circle was entitled to a 10 percent bonus. Likewise, if Zenda lost money, Double Circle would ab-

sorb 10 percent of the loss, limited to its management fee. We do not construe this provision of the agreement as providing for liquidated damages. It also does not indicate that damages from loss of profits were not contemplated.

Zenda's purpose in entering into the management agreement was to procure professional management services so that the cooperative might show a profit. It is certainly a stretch to conclude that the parties did not contemplate that the breach of this agreement would entail substantial losses such as those actually suffered by Zenda. We consider Double Circle's argument on this issue to be without merit.

Double Circle then argues that there was no evidence establishing lost profits with reasonable certainty. Zenda sought lost profits for 1989 of $239,046 and $187,139 from 1990, and loss of future profits of $351,363. The jury made no award for loss of future profits and substantially lesser amounts for the years 1989 and 1990. Despite that fact, juries are not obliged to enter awards which are crystal clear to the courts or to anyone else. The award must be within the evidence and not unduly speculative. We believe that based on the evidence, it was not error to submit the issue of lost profits to the jury. Zenda's primary witness on this issue was Bob D. DeVault, who had prepared annual audits of the Zenda cooperative for a number of years. DeVault testified that he prepared a compilation of statistical information on some 153 cooperatives, 35 to 40 of which were in central Kansas. At one point, the following testimony was given:

"Q. So we can look at this exhibit and tell what the—If Zenda had made the average margins and applied that to the sales that they generated in a particular year, you could then come up with a—what they should have had as a gross profit; is that correct?
"A. That would be one way to determine it, yes."

From the testimony of DeVault and from an examination of the exhibits which he prepared and which were marked and admitted, the jury had a reasonable basis on which to conclude what sort of profit Zenda could have made with competent management.

We conclude that the evidence was not so speculative that the trial court erred in submitting the issue of loss of profits to the

jury. We further conclude the jury's award as it relates to lost profits is supported by substantial competent evidence.

All of this is rather theoretical. The question of damages must be redetermined on remand. It is not possible for us to determine the exact evidence which may be used by the parties on a retrial of the issue of damages. Therefore, to the extent that our comments on this issue are helpful, we would consider our treatment of the problem to have been worthwhile.

## USE OF A CALCULATOR

When sending the jury to deliberate, the trial court stated, "I will send in the exhibits and the instructions and I think they got you a calculator in case you need it."

Double Circle objected to the trial court's action of permitting the jury to have a calculator, stating:

"I think when you send in a verdict form with the evidence and a calculator you are making an inference to the jury that is improper. I am not aware of any case I've been involved in where calculators are sent in at the outset without any request for one by the jury. I object to that. I wasn't aware that that would be done or I would have objected to it prior to going in."

It is this type of objection which indicates the intensity with which this case was tried. Double Circle has not shown that it was prejudiced to any extent by the trial court's action in providing a calculator to the jury. We believe that it was a matter within the discretion of the trial court and that the trial court did not abuse its discretion.

## PREJUDGMENT INTEREST

The jury's verdict in this case was itemized as to several claims which Zenda made against Double Circle. The trial court found that most of the claims were liquidated as of November 30, 1989, which was the date on which Zenda closed its books. The grain loss claims were determined to be liquidated as of September 29, 1988, and the Nicholas check on May 25, 1989. The claims for loss of profits were held to be unliquidated. The trial court awarded prejudgment interest on the following liquidated claims:

(1) Beeman note, judgment for $478.97, prejudgment interest at 12 percent.

(2) Beeman account receivable, judgment for $320.10, prejudgment interest at the 18 percent cooperative finance charge rate.

(3) Dick note, judgment for $1,826.26, prejudgment interest at 12 percent.

(4) Dick account receivable, judgment for $1,482.15, prejudgment interest at 18 percent finance charge rate.

(5) Nicholas check, judgment for $5,000, prejudgment interest at 10 percent statutory rate.

(6) Wilson claim, judgment for $1,288.90, prejudgment interest at 18 percent finance rate.

(7) Grain losses, $40,500, prejudgment interest at 10 percent statutory rate.

Double Circle attacks the award of prejudgment interest on the theory that all of the claims were unliquidated. Double Circle also attacks the rate as fixed by the trial court, arguing that in no event could the rate exceed the statutory interest rate of 10 percent.

We begin by noting that our decision on the statute of limitations may affect the amounts recoverable by Zenda on some of its claims. This is a problem left for the trial court to resolve. Our decision is only applicable to those claims or portions of claims still recoverable under the three-year statute of limitations.

"A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation. Where an amount is due upon contract, either express or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date." *Plains Resources, Inc. v. Gable*, 235 Kan. 580, Syl. ¶ 1, 682 P.2d 653 (1984).

Double Circle argues that the Beeman, Dick, Nicholas, and Wilson claims were unliquidated because the amounts due and owing varied from the petition to the pretrial order to the final amount of the judgment. It suggests that if Zenda did not know what was due on the claim at any particular time, the claim could not be liquidated. We do not agree. The amounts due on the notes and accounts receivable varied simply because, during the

course of the lawsuit, Zenda was receiving payments and applying payments to the accounts. The amounts due on these accounts and notes were always ascertainable by mathematical computation at any given time. The fact that the amount due and ascertainable varied from time to time due to collection efforts only makes the math somewhat more difficult; it does not render the claim itself unliquidated. The trial court did not err in holding the various accounts and notes due to Zenda were liquidated claims.

The grain losses present a different problem. These losses were caused when the Double Circle managers purchased grain and then left that grain purchase "open" on the grain market. A prudent grain operator will purchase grain for a certain amount and immediately resell it for a certain amount. The difference between what the grain was purchased for and what it sold for determines the profit or loss on that transaction. In this case, there were several transactions in which grain was purchased but not immediately sold, leaving those transactions open and resulting in an inability to determine a gain or loss on that transaction. We have no evidence in this record as to when the various grain purchases were "closed." This evidence is, presumably, in the daily grain logs which were not admitted into evidence. We conclude that under these facts, the amount of the grain losses were not ascertainable until the date Zenda closed its books. As a result, the grain losses could not be liquidated and could not draw prejudgment interest any earlier than November 30, 1989.

The trial court concluded that the grain losses became liquidated on September 29, 1988, which is the date on which David Luppes made notes on the losses and advised the Board. Our reading of the record indicates that the losses calculated by Luppes were not much more than an educated guess. On this particular date, there is no indication that the sale in question had even been closed, and, without that evidence, the amount of the loss on that transaction is not ascertainable. We conclude that the trial court erred in holding that the grain losses became liquidated on September 29, 1988. They could not have been liquidated, based on the record on appeal, any earlier than the day Zenda closed its books.

On remand, the grain losses must be recomputed based on a three-year statute of limitations. At that time, the court must redetermine whether those losses are liquidated and, if so, on what date they became liquidated. This determination should take into consideration the factors cited in this opinion.

Finally, we consider the interest rate applied by the trial court. Double Circle argues that the interest rates of 12 percent and 18 percent applied by the trial court on the Beeman, Wilson, and Dick claims were erroneous. We agree.

K.S.A. 16-201 sets the amount of interest to be applied to a liquidated claim at 10 percent unless the parties agree to a different amount. *Scott v. Strickland*, 10 Kan. App. 2d 14, 24, 691 P.2d 45 (1984). "A person who is not a party to the contract cannot be bound by the interest rate stated in that agreement." 10 Kan. App. 2d at 24.

Double Circle points out that it was not a party to any agreement between the Zenda cooperative and Wilson, Beeman, and Dick and, thus, cannot be bound by the interest rate agreed to by those parties. We agree. The correct prejudgment interest rate to be applied to these claims is the statutory rate of 10 percent and not the 12 and 18 percent rates applied by the trial court.

Double Circle also argues that an action for breach of an implied warranty of workmanlike performance sounds in both tort and contract and that prejudgment interest is inappropriate on a tort claim.

This argument conveniently overlooks the fact that Zenda had an option to proceed either in tort or in contract. It clearly proceeded in contract, and, in a contract action, prejudgment interest is appropriate.

## THE CROSS-APPEAL

### Breach of express contract

Zenda attempts to extricate itself from the effects from having proceeded on a theory of breach of an implied warranty of workmanlike performance. It does so by arguing on cross-appeal that Double Circle's failure to keep the Zenda board informed, and its failure to execute board-approved plans and policies, consti-

tuted a breach of express contract. Zenda then argues that since its losses were due to a breach of express contract, the jury's verdict should not be disturbed.

This is not a proper issue for appeal. Zenda is not appealing any decision by the trial court. It does not argue that the trial court erred in not instructing the jury on breach of express contract. It apparently seeks to protect its verdict on a "right for the wrong reason" argument.

This issue is totally without merit. The approved jury instructions did not submit the issue to the jury on a breach of express contract. The jury was instructed on the breach of an implied warranty of workmanlike performance. Zenda did not object to the instructions or to the jury form submitting the case to the jury on this theory.

This issue was not raised at the trial court level. Zenda cannot present a theory on appeal not presented to the trial court. *Plummer Development, Inc. v. Prairie State Bank*, 248 Kan. 664, Syl. ¶ 3, 809 P.2d 1216 (1991).

Exclusion of evidence

Zenda next argues that the trial court erred in excluding from evidence certain documents known as "Daily Grain Position Statements."

The record shows that the trial court excluded these documents due to Zenda's failure to comply with discovery requests. Documents were requested by Double Circle and were shown to have been within the exclusive control of Zenda. Despite this fact, the items were not produced until two days before trial. By that time, Double Circle had already deposed Zenda's expert regarding the issue of grain speculation without the requested documents.

The trial court ruled that the documents were not admissible and stated:

"And, secondly, the grain position papers. There's no way I am going to let those in based on what you just told me because I—I cannot believe that the discovery he instituted didn't contemplate receiving copies of those papers and why they weren't—if you had them in August and you sent them to him last Thursday, that's beyond me. I don't buy that they weren't of any value to him until the FCC papers were obtained. It really isn't your choice to determine what value

they are to him. And since they were in the sole control of the co-op, I think you at the very least didn't comply with the—with a discovery request. And I don't see any justification for allowing those in under this set of circumstances under the—the set of circumstances that you detailed to me. So—And—And we're way out of bounds with regard to this witness going into comparisons of those at this date."

We agree with the trial court. "Rulings on admissibility of evidence fall within the sound discretion of the trial court. Thus, one attacking evidentiary rulings must show abuse of discretion. An abuse of discretion exists only when no reasonable person would take the view adopted by the trial court." *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 9, 822 P.2d 617 (1991).

We find no abuse of discretion by the trial court in its ruling on the grain position papers. We cannot say that no reasonable person would exclude those items from evidence when they were produced only two days before trial in a case where extensive discovery had been undertaken on precisely the issue addressed by the excluded documents. The exclusion of these documents from evidence is a problem of Zenda's own making, and we affirm the trial court's ruling with regard to the admissibility of the grain position papers.

Feedlot policy and daily statements

The trial court also excluded from evidence a Zenda board policy regarding the sheep feedlot and daily account statements to Triple C.

These documents were excluded from evidence because of Zenda's failure to produce them during discovery. We affirm the trial court's decision on this issue for the same reasons stated in the discussion concerning the daily grain position statements.

Itemization of damages, including attorney fees and accounts receivable

Zenda argues that the trial court abused its discretion in limiting the rebuttal testimony of Michael Gillian. Zenda sought to elicit testimony on rebuttal regarding former manager Wilson reimbursing himself $110 in cash for travel expenses. The trial court excluded this testimony as improper rebuttal. The trial court also

excluded exhibits showing Wilson had written a check for supplies that also included personal items.

"Rebuttal evidence can be introduced only after the parties have closed their case in chief and is limited to issues placed in conflict by the adverse party. It is clearly within the discretion of the trial court to determine whether rebuttal evidence is admissible, and the ruling of the court will not be grounds for reversal unless it appears the discretion has been abused to the prejudice of the complaining party." *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, Syl. ¶ 11.

We find no abuse of discretion in the trial court's rulings on rebuttal evidence. On the issue of whether Wilson reimbursed himself for travel, the record shows that Zenda did not inquire of this item in its case in chief. It was simply not proper rebuttal testimony. As to personal items purchased and charged to Wilson's account, Double Circle admitted those items. The result is that the personal charges were not an issue and not proper rebuttal testimony.

Zenda next argues that the trial court erred by failing to include on the verdict form as itemized damages attorney fees incurred in the collection of the Thimesch account. Zenda's problem is that it did not object to the verdict form submitted to the jury.

The failure to object to an issue submitted to the jury by way of special question prevents an appellant from raising the issue to an appellate court. *Bick v. Peat Marwick & Main*, 14 Kan. App. 2d 699, 703, 799 P.2d 94, *rev. denied* 247 Kan. 703 (1990).

Farmland Industries

Finally, Zenda argues that the trial court erred in not allowing the mention of Farmland Industries where necessary to prove written documents.

The trial court dismissed Farmland as a party defendant and instructed counsel not to mention Farmland any more than necessary. Zenda argues that keeping Farmland from being mentioned created chaos throughout the trial and was error.

Zenda cites an instance in which the trial court required a letter be redacted by replacing the mention of "Farmland" with "Double Circle."

This is an item addressed to the sound discretion of the trial court, and we see no abuse of discretion. In addition, Zenda to-

tally fails to demonstrate how minimizing the reference to Farmland prejudiced it. It appears to us that the exclusion of any mention of Farmland was necessary to prevent prejudice from arising in the minds of the jurors and that this ruling was well within the discretion of the trial court.

Affirmed in part, reversed in part, and remanded.